UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | DOCKET NO. 2:20-cr-41-JDL |
| ) | |
| v. ) | |
| ) | |
| ANTRON OWENS ) | |

## MOTION TO SUPPRESS EVIDENCE

Now comes Defendant Antron Owens, by and through counsel, and moves this Honorable Court to suppress at trial all evidence of any kind secured as a result of an illegal seizure and nonconsensual search of the defendant on October 29, 2019.

### SUMMARY

This case involves a motor vehicle stop for an expired registration that was unlawfully and egregiously extended beyond the time necessary to issue a summons for the violation. In *Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015), the Supreme Court determined that a seven- to eight-minute detention following the completion of a traffic stop to perform a K-9 sniff violated the Fourth Amendment of the Constitution. In this case, Defendant was detained far longer than seven or eight minutes after the officer should have issued a ticket. Indeed, forty-five minutes passed before a K-9 officer and his dog arrived. Defendant was not only illegally detained, but was also searched without his consent or any other legal justification. Defendant seeks an order from this Court suppressing the fruits of the officer's illegal actions.

1

**FACTS CONTAINED IN DISCOVERY**

On October 29, 2019 at 3:15 a.m., a black Kia Soule was stopped traveling northbound on the Maine Turnpike by Maine State Police Sgt. Thomas Pappas just south of the Kennebunk exit. It was raining. The stop was recorded on multiple cruiser cameras. The vehicle was registered in Maine, but the registration had expired at the end of July. The driver of the vehicle was Danielle Eames-Powe, a thirty-five year old Caucasian female. Eames-Powe had been living in the car with her boyfriend, the registered owner, after being forced to vacate an uninhabitable apartment a few weeks prior. The trunk of the vehicle was crammed with bags of Ms. Eames-Powe's belongings because she had been living in her car, as shown in the below image taken from the cruiser video of the stop:



Also in the vehicle were two black males in their mid/late twenties. Defendant Antron Owens was in the front passenger seat and his cousin Terrell Owens was in the back seat.

During the initial interaction with Pappas, Eames-Powe produced proof of insurance but did not have her driver's license in the front of the car. She informed Pappas that she was driving her boyfriend's car and asked to retrieve her driver's license from the rear cargo area of the SUV. Terrell Owens provided his identification. Defendant Owens did not have identification but provided his correct name.

Pappas allowed Eames-Powe to walk to the back of the car and she began to go through her belongings for her identification. As Eames-Powe searched, Pappas scanned the interior of the rear area with his flashlight and noticed an empty plastic baggie as Eames-Powe was looking through her wallet. Pappas asked Eames-Powe to explain the empty baggie and she said it contained carrots that she ate earlier and did not want to throw the baggie on the ground. There was nothing whatsoever in the baggie; not a pill, no residue, nothing. Pappas also noticed a plate amongst her belongings and she again explained that she lived in her car. As she continued to look for her identification, a second officer arrived on the scene, Trooper John Darcy. Pappas told Darcy to get information from the passengers and ordered Eames-Powe to empty her pockets, which she did. There was nothing of interest in her pockets.

Five minutes into the stop,[1] Pappas returned to his vehicle while he made Eames-Powe stand outside in the rain, answering his questions through his passenger window. Eames-Powe was unable to locate her license and provided her correct name and date of birth to Pappas. Pappas asked where

---

[1] The stop occurred approximately 2 minutes and 40 seconds after Pappas' dashboard video starts recording. The time on the video at this point is 7:40. References to the video's time will hereinafter be cited as @XX:XX.

3

she was coming from and she told him New York—she explained she did not know where exactly because she is bad with directions. Pappas asked if she had ever been arrested and she stated that she was arrested eight or ten years ago for trafficking oxycodone and had served time in prison, but had not been in any trouble since. Pappas asked how she knew her passengers and she explained that she met Defendant Owens in Bangor where they both live and met his cousin in New York.

Seven minutes into the stop,[2] Pappas called into dispatch and requested a K-9 officer. Pappas asked Eames-Powe about a q-tip he observed on the center console and she reminded him that she was living in her car and had a box of q-tips in her glove box. Eight minutes into the stop,[3] Pappas located Eames-Powe in the state database and verified her identity. Darcy walked over to Pappas and provided Defendant Owens' name and date of birth. There were no warrants outstanding for anyone in the vehicle. A minute later, dispatch called Pappas back and informed him that the K-9 officer he requested did not answer so she left him a message.

It is unclear why Pappas did not issue a summons to Eames-Powe at this point. Instead, he prolonged the stop to ask Eames-Powe to explain why she was driving with her two black passengers. She explained that she and Defendant Owens drove from Bangor to New York to pick up Owens' cousin, Terrell. She did not know either male's birth names, only their nicknames. Pappas asked how long she was in New York and she said three or four days. She explained that she met Defendant Owens' family and had stayed in her car during the trip. Pappas questioned her about sleeping in the car and she reminded him that she lived in her car and did not want to intrude on Defendant Owens' family time. Pappas continued to detain and question her about the trip.

---

[2] @9:40
[3] @10:53

4

Sixteen minutes into the stop,[4] Pappas called South Portland Police K-9 Officer Shane Stephenson directly and asked him to come to the stop with his dog. It is unclear why Pappas waited twenty minutes[5] into the stop before he called in the registration of the vehicle. He then walked back to the Kia and questioned Defendant Owens and his cousin about the trip. They provided responses consistent with Eames-Powe's answers.[6]

As he continued to detain everyone while waiting for the K-9 to arrive, he noticed that Eames-Powe and Defendant Owens were listed in the database but the entries were marked with "no access" designations and he was prohibited from exploring the information. Approximately thirty-one minutes into the stop,[7] the K-9 officer still had not arrived and Pappas decided to contact Peter Mador with the Maine Drug Enforcement Agency to learn about the confidential information to which he had no access. Mador agreed to research the information and get back to him.

It is unclear why Pappas waited thirty-four minutes into the stop before he decided to use Eames-Powe's cell phone to call her boyfriend to confirm that she had permission to use the vehicle. After doing so and while still waiting for the K-9 officer to arrive, Pappas continued to ask Eames-Powe random questions: When was the last time she ate? Where did her boyfriend live? What car did her boyfriend drive if she had his?

Approximately forty-six minutes into the stop,[8] Ofc. Stephenson arrived and began the K-9 sniff, which is captured on video. The sniff search was less than 40 seconds. The dog walked around

---

[4] @18:05

[5] @22:27

[6] According to his report, Pappas recognized Defendant Owens from a motor vehicle stop on June 27, 2019, in which he was a passenger. During that stop, the car was searched. No drugs or weapons were located during the search and no arrests were made. Pappas found it suspicious, however, that two black males would have several thousand dollars and apparently made a mental note of it.

[7] @34:30

[8] @48:10

the car once. Both passengers had their windows rolled down. The dog walked by the passenger side of the Kia without detecting any odors. In his report, Stephenson maintains that the dog alerted on the driver's side of the vehicle as follows:

> K-9 Zak began performing deep nasal exchanges once we reached the driver's side. K-9 Zak's ears pointed forward when he reached the passenger door (on the driver's side) and he got up on his hind legs. K-9 Zak was sniffing heavily and pulling towards the roof area of the car. I held tension on the lead and K-9 Zak came back to me for his reward.

According to the video, Zak does jump up briefly on the driver's side of the car. The leash, however, was never pulled in the process. In fact the video shows the opposite—a very slack leash. The dog also never comes back to Stephenson for a reward but instead just wanders off away from the vehicle. When Stephenson briefly pulls the dog back towards the rear of the vehicle, the dog is uninterested and tries to walk away from the vehicle again. Stephenson pulls the dog back towards the vehicle one last time. When the dog's interest is still not piqued, Stephenson finally returns the dog to his cruiser while indicating to the other officers that the dog alerted.

Just after the sniff was complete, Mador called Pappas back and indicated that he only found Defendant Owens in connection with a traffic stop on June 27, 2019, but that was it. Pappas asked Mador for the 'no access' information. Up to this point in the conversation, Mador's voice was audible on the recording. At this point, however, Mador's voice becomes inaudible and it is unclear what information, if any, was provided because Mador's responses cannot be heard.

One hour into the stop, the Kia had not yet been searched. A female officer arrived to search Eames-Powe. Nothing was found. Nevertheless, Pappas exited his vehicle and placed Eames-Powe in handcuffs behind her back and placed her in his vehicle. Pappas then walked to the Kia and directed Defendant Owens to exit the vehicle, which he did. Again, the Kia had not yet been searched. Pappas told Defendant he was being detained and immediately handcuffed him. Pappas

then asked Defendant Owens if he had anything on him. Defendant answered, "No." Pappas asked, "Do you mind if I pat you down?" Defendant answered, "Yes." Pappas started patting Defendant down anyway and as he was doing so, asked, "You don't mind?" Defendant again said, "Yes." Pappas felt something in Defendant's waistband, raised his shirt and located a bag with what appeared to be crack cocaine inside. Defendant was arrested and the underlying charges followed. No drugs were found in the vehicle.

## LEGAL ARGUMENTS

### I. THE INVESTIGATIVE MEASURES USED BY THE POLICE EXCEEDED THE SCOPE OF THE STOP.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. "It is common ground that a traffic stop constitutes a seizure of both the stopped vehicle and its occupants for Fourth Amendment purposes." *United States v. Arnott*, 758 F.3d 40, 43 (1st Cir. 2014).

Pursuant to the Fourth Amendment, any police action during a traffic stop "must be reasonably related in scope to the stop itself 'unless the police have a basis for expanding their investigation.'" *United States v. Ruidiaz*, 529 F.3d 25, 29 (1st Cir. 2008) (quoting *United States v. Henderson*, 463 F.3d 27, 45 (1st Cir. 2006)). "[A]bsent the reasonable suspicion ordinarily demanded to justify detaining an individual, a police officer may not prolong a traffic stop to conduct a K-9 sniff beyond the time necessary to handle the traffic violation that justified the stop." *United States v. Ramdihall*, 859 F.3d 80, 90 (1st Cir. 2017) (internal quotation marks omitted) (quoting *Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015)). Thus, in construing the legality of a stop, the Court must determine whether the officers' actions ever departed from their mission in a

way that prolonged the stop and, if so, whether they had reasonable suspicion to take those actions. *Id.* at 1615-1616.  In determining the reasonable duration of a stop, "it [is] appropriate to examine whether the police diligently pursued [the] investigation" *United States v. Sharpe*, 470 U.S. 675, 686, 105 S. Ct. 1568, 1575 (1985) (internal citations omitted) (alterations added).

Here, the facts known to the police did not justify a K-9 sniff search at its inception, nor did sufficient facts develop during the time in which Pappas *should* have completed the stop's "mission" to justify the prolonged detention while waiting for a K-9 officer.  Although legitimately stopped for the expired registration, the lawfulness of the officer's actions dissipated as he held them minute after minute on scene without a reasonable articulable suspicion that drugs were actually in the car.  What he had was a hunch and he placed his hope on a dog sniff to validate that hunch, but in so doing, illegally held these individuals captive.  The Constitution cannot shield an otherwise unlawful stop merely because illegally activity is eventually uncovered.  And by the time the K-9 officer finally arrived, the once-legitimate stop had morphed into a de facto arrest.

Detentions of a person that restrain his or her freedom of action more than a brief investigatory stop, even when no formal arrest occurs, are permissible only if supported by probable cause to believe a crime has or is being committed. *See Dunaway v. New York*, 442 U.S. 200 (1979). In this case, the forty-six minute detention waiting for the K-9 officer was tantamount to an arrest and was entirely unreasonable and illegal.  Application of the exclusionary rule is appropriate because, as the Supreme Court has stated, "granting establishment of the primary illegality [here the unlawfully prolonged seizure], the evidence to which instant objection is made has been come at by exploitation of that illegality." *Wong Sun v. United States*, 371 U.S. 471, 488 (1963) (quoting Maguire, Evidence of Guilt, 221 (1959)).

## II. THE SEARCH OF DEFENDANT WAS UNJUSTIFIED.

First, because the detention was illegally prolonged, actions taken by police during the unlawful detention were likewise unlawful. It matters not whether the K-9 alerted during the sniff search because the search occurred in the midst of the illegal operation. Second, even if the Court condones the prolonged detention to effectuate the K-9 search, there was no indication from a review of the video that the dog actually alerted to the presence of drugs in the vehicle. The police, therefore, had no basis to extend the stop further and order Defendant Owens out of the vehicle. Third, even if the K-9 had alerted on the driver's side of the vehicle, thereby providing probable cause to search the vehicle, there was still no basis to search Defendant Owens.

The authority to frisk a suspect is a separate issue from the determination of whether to stop. A pat down frisk is justified only if, under all of the circumstances, an officer has "a particularized and objective basis to suspect the individual [has] a weapon." *United States v. Mohamed*, 630 F.3d 1, 6 (1st Cir. 2010). Thus, an officer may only frisk a passenger in a vehicle lawfully stopped if the officer has a reasonable basis to suspect the passenger is armed and dangerous. *Arizona v. Johnson*, 555 U.S. 323, 326-27 (2009). An exception to this rule is consent.

The Government bears the burden of proving by a preponderance that consent to a search was in fact given and was voluntary. *United States v. Vanvliet*, 542 F.3d 259 (1st Cir. 2008). The Supreme Court warned that "to approve [consent] searches without the most careful scrutiny would sanction the possibility of official coercion" and that "constitutional provisions for the security of person and property should be liberally construed" to prevent "stealthy encroachments" upon constitutional rights. *Schneckloth v. Bustamonte,* 412 U.S. 218, 228-29, 93 S. Ct. 2041 (1973) (quoting *Boyd v. United States*, 116 U.S. 616, 635, 29 L. Ed. 746, 6 S. Ct. 524 (1886))

To be valid, consent must be provided by a suspect by either word or act, but the words or conduct must be unambiguous, and the consent must be freely and voluntarily given. *United States v. Figueroa-Figueroa*, 388 F. Supp. 3d 70, 82 (D.P.R. 2019). *See also*, *Gorman v. United States*, 380 F.2d 158, 163 (1st Cir. 1967) (consent must be "unequivocal, specific and intelligently given, uncontaminated by any duress or coercion," citing *Simmons v. Bomar*, 349 F.2d 365, 366 (6th Cir. 1965)). In *Figueroa-Figueroa*, the District Court of Puerto Rico adopted the following guidelines from the Ninth Circuit for construing "effective consent" to a search:

> "It must show that there was no duress or coercion, express or implied. The consent must be 'unequivocal and specific' and 'freely and intelligently given'. There must be convincing evidence that defendant has waived his rights. There must be clear and positive testimony. 'Courts indulge every reasonable presumption against waiver' of fundamental constitutional rights'. Coercion is implicit in situations where consent is obtained under color of the badge, and the government must show that there was no coercion in fact."

388 F. Supp. 3d 70, 83 (D.P.R. 2019), (quoting *United States v. Page*, 302 F.2d 81, 83-84 (9th Cir. 1962) (internal citations omitted).

In this case, there was no basis to suspect that Defendant Owens was armed and dangerous when he was ordered out of the vehicle so as to justify a frisk. Likewise, there was no probable cause to arrest Defendant Owens, and therefore, Pappas' search of his person cannot not be justified as incident to his arrest. And of course, there was no warrant permitting the search.

Bottom line, a legal justification to frisk Defendant Owens was nonexistent. Pappas was aware of this and asked for consent. To the extent that Pappas suggests that the exchange between he and Defendant evidenced consent, the facts revealed on the video do not support this position. Specifically, Pappas asked Defendant Owens if he had anything on him. Defendant answered, "No." Pappas asked, "Do you mind if I pat you down?" Defendant answered, "Yes." This is the opposite of consent. Pappas searched him anyway.

10

To the extent that Pappas suggests that Defendant consented when he asked him a second time, the following is hardly unambiguous and unequivocal:

Pappas: "You don't mind?"
Defendant, "Yes."

This is the exact type of "stealthy encroachment" the Supreme Court warned of in *Schneckloth*. This is the exact type of police coercion this Court must not sanction. Accordingly, because there was no other legal justification for the search, it was illegal and any evidence derived therefrom must be suppressed.

Wherefore, Defendant Owens moves this Honorable Court to suppress at trial all evidence of any kind secured as a result of the illegal seizure and nonconsensual search on October 29, 2019.

Dated: June 15, 2020                   /s/ Heather Gonzales
                                       Heather Gonzales
                                       Assistant Federal Public Defender
                                       Counsel for the Defendant
                                       P.O. Box 595
                                       Portland, Me 04112-0595
                                       207-553-7070

### CERTIFICATE OF SERVICE

I, Heather Gonzales, hereby certify that I have caused on this date the within Motion to Suppress Evidence to be served upon Assistant United States Attorney Meghan Connelly, Esq., by forwarding a copy to her via the Court's ECF System.

Dated: June 15, 2020                   /s/ Heather Gonzales
                                       Heather Gonzales, Esq.
                                       Counsel for the Defendant