UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Docket No. 2:20-cr-41-JDL |
| | ) | |
| ANTRON OWENS | ) | |

**GOVERNMENT'S OPPOSITION TO MOTION TO SUPPRESS EVIDENCE**

The United States of America, by and through its attorneys, Halsey B. Frank, United States Attorney for the District of Maine, and Meghan E. Connelly, Assistant United States Attorney, respectfully objects to Defendant Antron Owens's Motion to Suppress.

The defendant seeks to suppress evidence obtained from the traffic stop of a vehicle in which he was a passenger on October 29, 2019. The officer had reasonable suspicion that the vehicle's registration had expired when he instituted the stop. While stopped, several pieces of evidence emerged which provided reasonable suspicion that criminal activity beyond an unregistered vehicle was afoot. This permitted further inquiry and the deployment of a K-9 unit, who alerted to the presence of drugs in the vehicle. Because drugs and guns often appear together, the officer had a reasonable and objective basis to suspect the defendant could be armed and gently patted him down, resulting in the discovery of approximately 114 grams of crack cocaine. Accordingly, the defendant's motion should be denied.

**Statement of Facts[1]**

On October 29, 2019, at 3:15 a.m., Maine State Police Sgt. Thomas Pappas (hereinafter "Pappas") observed a black Kia Soule travelling north on the Maine Turnpike at about mile marker 23 near Kennebunk. The vehicle had a Maine registration that expired nearly three

---

[1] Unless otherwise indicated, all facts are drawn from the dash camera video from Sergeant Pappas's vehicle.

1

months earlier. Pappas turned on his emergency lights and signaled for the car to pull over. Instead of pulling over onto the right shoulder, the Kia dangerously came to a halt in the median of the Turnpike. This strange behavior made Pappas initially suspicious something was amiss, as in his experience that behavior was typical of new or impaired drivers, or drivers who were extremely anxious to see emergency lights come on behind them. (Pappas Continuing Report. ¶ 9).

After Pappas succeeded in getting the Kia to pull over to the correct side of the turnpike he approached the vehicle. He found thirty-five year old Danielle Eames-Powe (hereinafter "Eames-Powe") in the driver's seat, accompanied by Defendant Antron Owens (hereinafter "Defendant") in the passenger seat and Terrell Owens (hereinafter "Owens") in the back seat. The two passengers are cousins. Eames-Powe appeared disheveled and did not appear to have bathed in a few days. (*Id.* at ¶ 4). She told Pappas that the car was not hers but belonged to her boyfriend. Pappas recognized the defendant from a prior traffic stop on June 27, 2019, during which the defendant was in possession of thousands of dollars in cash without explanation and had been extremely uncooperative with officers. *(Id.* at ¶ 5). The defendant did not have any identification but gave Pappas his name. Owens had been lying down in the back seat, apparently sleeping without a seat belt, which Pappas noted as odd behavior during a traffic stop. (*Id.* at ¶ 9). Owens provided Pappas with identification.

Eames-Powe was initially unable to provide Pappas with her license or identification. She asked Pappas if she could get her license from the back of the car. She began aimlessly searching in the rear of the car, once returning to check the back seat. The back of the car was full of bags containing articles of clothing and odd items like plates. After less than two minutes of rummaging, during which time her behavior grew increasingly panicked, she gave up the hunt.

As she ended her search, Trooper John Darcy (hereinafter "Darcy") arrived and began interviewing the passengers, the defendant and Owens. Darcy also recognized the defendant from the prior stop.

During his initial scan of the interior of the vehicle, Pappas noticed three items which, when combined, led him to believe drugs may be present in the vehicle. First, Pappas saw a Q-tip in the center of the console, which he is aware from his training and experience, the cotton portion of the Q-tip can be used to prepare heroin and fentanyl for injection. (*Id.* at ¶ 4, 9). Second, when Eames-Powe brought out her purse there was an empty plastic baggie, which Pappas is aware from his training and experience, to be of the kind often used to hold drugs, located in her wallet. When asked about the baggie, Eames-Powe became extremely defensive, claimed it was to hold celery sticks she had eaten earlier, and hadn't wanted to throw it away. She then stuffed the baggie under the bags in the rear of the car. Third, Pappas saw a plate randomly placed in the cargo area. In his training and experience, Pappas was aware plates could be used for drug use as well as during packing and sales. (*Id.* at ¶ 9). After Pappas pointed the plate out to Eames-Powe, she tried explaining she had been travelling a lot recently and had lots of stuff in the car. She then informed Pappas she had been living out of her car for a few weeks.

After Eames-Powe failed to locate any identification, Pappas asked her to come closer to his patrol car and empty out her pockets. Eames-Powe accused Pappas of being rude and answered combatively when he asked to see a receipt that she removed from her pocket. After getting her name and date of birth, Pappas asked where she was coming from. She responded by saying she was coming from New York, but could not identify where in New York she had been staying. She blamed her confusion on a bad sense of direction. Pappas asked how she knew the other occupants of the car and she responded that she had met them through a friend. She also

admitted to having served fourteen months in prison on an oxycodone trafficking charge eight to ten years prior.

While speaking with Eames-Powe, Pappas also searched for information regarding the passengers of the vehicle. That search revealed drug-related information on both Eames-Powe and the defendant. (*Id.* at ¶ 10). Based on all the information he had garnered, Sgt. Pappas requested a K-9 unit to conduct a sniff test. (See *id.* at ¶ 9-10). This occurred seven minutes into the stop.

Pappas confronted Eames-Powe about the Q-tip on the center console. She defended by simply replying that she had a whole box of them and that she was living in the car without addressing why one would be out on the console. At approximately nine minutes into the stop, dispatch informed Pappas they had been unable to reach a K-9 officer but had left a message.

Pappas continued to ask clarifying questions to Eames-Powe. Eames-Powe revealed she did not know either of the other occupants' first names. She further admitted despite being in New York for three to four days and meeting the defendant's family, she had nevertheless slept in the car the whole time. She insinuated were she to request to stay at the defendant or Owens' home she might have to pay them back in other ways, noting unspecified "innuendoes" or quid pro quos that might be asked of her. Eames-Powe also confessed to having stolen toll money from the defendant in order to buy fast food on the drive up and asked Pappas not to tell him. Together, these facts strengthened Pappas's suspicion that there was a criminal element beyond an expired registration. (*Id.* at ¶ 12).

After this conversation Pappas called South Portland Police K-9 Officer Shane Stephenson (hereinafter "Stephenson") directly and asked him to come conduct a K-9 search. It appears from the video it took a few minutes and multiple calls to organize Stephenson coming

to the scene to conduct the search. Pappas then asked the defendant and Owens a few questions confirming they had been in New York. While they waited for the K-9 to arrive Pappas attempted to call the owner of the vehicle to confirm Eames-Powe had permission to use the car. Pappas was unable to make contact initially. Pappas also called Peter Mador (hereinafter "Mador") of the Maine Drug Enforcement Agency to inquire into information relating to the defendant's file he could not access. Mador said he would call Pappas back. Subsequently, Eames-Powe's boyfriend called back and confirmed Eames-Powe had permission to use the vehicle. Pappas continued to question Eames-Powe while they waited for Stephenson to arrive.

Forty-six minutes after the stop, at 4:03 a.m., Stephenson arrived with K-9 Zak. Stephenson brought Zak around the passenger side where the dog paused. As Stephenson, brought Zak around the front of the vehicle and past the driver-side passenger door, Zak pointed his ears forward. Zak then leapt at the passenger door placing his paws on it before Stephenson pulled back on the leash. Stephenson almost immediately signaled to Darcy that the dog had alerted to the presence of drugs in the car. (See Stephenson Report at1).

At about the same time Zak alerted officers to the presence of drugs in the car, Pappas received a call from Mador. Pappas conferred with Mador about the suspects' possible criminal histories and the possible involvement of the Kia in another case. He also called to request a female officer to come pat down Eames-Powe, while Stephenson spoke to Owens. When asked why a K-9 would have alerted on the vehicle, Owens denied narcotics in the vehicle. When asked if he had been to Maine, Owens paused and claimed he had a "girl" in Brewster named Tiffany but whose last name he could not pronounce.

A female officer arrived at approximately 4:17 a.m., an hour after the initial stop. She patted down Eames-Powe and found no drugs on her person. Pappas informed Eames-Powe she

was not being arrested but would be detained and handcuffed. He then walked over to the vehicle and asked the defendant to exit the Kia. Pappas told the defendant he was being detained and handcuffed him. Pappas asked the defendant if he had anything on him, which the defendant denied. Pappas further asked the defendant if the defendant minded if Pappas patted him down. The defendant answered "Yes." Pappas clarified, asking "You don't mind?" The defendant answered "Yes." Almost immediately upon touching the defendant's waist, Pappas discovered a bag of what appeared to be illicit drugs tucked into the defendant's waistband. Pappas brought the defendant over to the front of the patrol car in plain view of the dash camera and placed the bag of drugs on the hood of the cruiser. The substance tested presumptive positive for cocaine base after a Tru Narc test. (Pappas Continuing Report at ¶ 16).

Pappas subsequently searched Owens. While the initial search proved fruitless, ten grams of what Pappas believed to be fentanyl was found in a baggie hidden in Owens's groin upon a second search. (*Id.* at ¶ 20). In the interim, Pappas and Stephenson searched the Kia. They found numerous drug paraphernalia including a crack pipe, needle, spoon, and pieces of cotton Pappas recognized, in his training and experience, as the byproduct of heroin or fentanyl injections. The vehicle was towed and the occupants were brought to York County Jail where they were charged with aggravated trafficking. (*Id.* at ¶ 21-22).

## Argument

**I.     Sgt. Pappas Had Reasonable Suspicion of Additional Criminal Wrongdoing and Permissibly Expanded the Scope of his Investigation beyond the Expired Registration**

Traffic stops fall within the ambit of the kind of investigatory stops known as *Terry* stops rather than true arrests. *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (citations omitted); *United States v. Dion*, 859 F.3d 114, 123 (1st Cir. 2017). Their oversight consists of two prongs.

*E.g., United States v. Ruidiaz*, 529 F.3d 25, 28 (1st Cir. 2008). First, the officer "must have a reasonable, articulable suspicion of an individual's involvement in some criminal activity in order to make the initial stop." *Id.* Second, police actions taken during the stop "must be reasonably related to the scope of the stop *unless* the police have reason to expand the scope of their investigation. *Id.* at 28-29 (emphasis added) (quoting *United States v. Henderson*, 463 F.3d 27, 45 (1st Cir. 2006)). Police officers may conduct "ordinary inquiries incident to [the traffic] stop." *Dion*, 859 F.3d at 124 (alteration in original) (quoting *Rodriguez*, 575 U.S.at 355). Permissible inquiries during the initial stop may include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance, as well as conducting criminal record searches to ensure officer safety." *Id.* at 124. Officers are also permitted to inquire about a driver's itinerary. *Id.* at 125 (citing *United States v. Fernandez*, 600 F.3d 56, 60-62 (1st Cir. 2010)).

When answers to these inquiries engender reasonable suspicion that additional criminal activity is afoot, an officer may expand the scope and focus of his or her inquiry. *United States v. Chhien*, 266 F.3d 1, 6 (1st Cir. 2001); *see also Terry v. Ohio*, 392 U.S. 1, 10 (1968) (noting police require an escalating set of flexible responses in proportion to the information they possess). These changes in suspicion are "neither unusual nor impermissible." *United States v. Sowers*, 136 F.3d 24, 27 (1st Cir. 1998). While reasonable suspicion requires more than a naked hunch, it requires less than probable cause. *Dion*, 859 F.3d at 124 (quoting *United States v. McGregor*, 650 F.3d 813, 821 (1st Cir. 2011)). Reasonable suspicion does not require a *direct* link between the suspect and the suspected criminal activity. *Ruidiaz*, 529 F.3d at 29 (emphasis in original) (citing *Chhien*, 266 F.3d at 6). Rather, evaluating the legitimacy of an officer's reasonable suspicion calls for a "focus on what a reasonable law enforcement officer in the same

or similar circumstances would have thought" and an inquiry into the existence of "specific, articulable facts" giving rise to the suspicion. *United States v. Ramdihall*, 859 F.3d 80, 91 (1st Cir. 2017). Accordingly, courts "grant respect to the ability of trained and experienced police officers to draw from the attendant circumstances inferences that would elude an untrained person." *United States v. Tiru-Plaza*, 766 F.3d 111, 116 (1st Cir. 2014) (internal quotation omitted); *see also Ruidiaz*, 529 F.3d at 29 (noting experienced officers are owed a measurable degree of deference).

The defendant does not contest that the expired registration satisfies the first prong. Instead, he theorizes Pappas did not have sufficient facts to formulate a reasonable suspicion of criminal activity beyond the expired registration. Pappas requested a K-9 unit seven minutes into the stop. During those seven minutes, Pappas's actions were wholly within the permissible scope of the stop. He asked the passengers in the car to produce identification and allowed the driver to search the car when she was unable to produce any. He inquired as to the ownership of the vehicle and where they were coming from. Pappas ran background checks on the criminal histories of the occupants. Given the emerging information that triggered his suspicion, he asked about suspicious items plainly in view.

At the time he called for a K-9 unit, Pappas had the following information that engendered a reasonable suspicion there was additional criminal activity: The car had failed to pull over properly. The owner of the car was not present. Two of the three occupants of the car, including the driver Eames-Powe, were unable to provide identification. The other occupant attempted to sleep through a traffic stop. Eames-Powe appeared anxious, disheveled, and exhibited erratic and increasingly panicked behavior. There were three items in the car (the Q-tip, the baggie, and the plate) that could be associated with opiate use, one of which (the baggie)

Eames-Powe furtively tucked out of sight. Eames-Powe could not name where in New York she had stayed and only knew the other occupants through "a friend." Eames-Powe and the defendant had been involved in drug-related activity in the past. The defendant radically altered his behavior from the previous encounter in the summer of 2019, and was now cooperating. These are precisely the kind of specific, articulable facts that, when combined with rational inferences, would suggest to a veteran Maine State Police Sergeant with a decade and a half of experience and a specialization in drug investigations, there might not just be a registration issue. The defendant's claim these facts justify nothing more than "a hunch" stretches credulity beyond its breaking point.

Furthermore, Pappas's suspicions based on his specific observations in this case find support in this Circuit's precedents. *See Dion*, 859 F.3d at 127 (noting previous criminal misdeeds, regardless of how long ago they occurred, may factor into a finding of reasonable suspicion); *id.* (explaining extreme nervousness in addition to other factors justified reasonable suspicion); *United States v. Chaney*, 584 F.3d 20, 26 (1st Cir. 2009) (same); *Ramdihall*, 859 F.3d at 92 (attempting to hide a plastic baggie contributed to a finding of reasonable suspicion). The defendant's attempts to explain away some individual factors fall flat, as "the Supreme Court has flatly rejected just this sort of divide-and-conquer analysis because it is inconsistent with the requirement that courts examine the totality of the circumstances." *Dion* 859 F.3d at 125 (internal quotations omitted) (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)). The sum of Pappas's observations and inferences during these first several minutes were more than sufficient to meet the reasonable suspicion standard.

The defendant's attempt to use *Rodriguez* as an escape hatch is therefore misplaced. *Rodriguez* held a police officer could not conduct checks which prolonged a traffic stop *absent a*

*reasonable suspicion* of other wrongdoing. *Rodriguez*, 575 U.S. at 355 (emphasis added). Because Pappas's suspicions were reasonably based on articulable facts, this argument fails to make it out of the starting gate.

The additional facts which came to light in the interim between when Pappas first requested a K-9 unit and Stephenson arrived, further justified his suspicion. Eames-Powe did not know the first names of either the defendant or his cousin, she had gone to New York without money or food and had been subjected to sleeping in her car, and she had been forced to steal money from the defendant to feed herself. This deluge of suspicious information continued to substantiate Pappas's determination a K-9 was warranted and was a necessary responsive measure to an unfolding scene.

Contrary to the defendant's suggestion, forty-six minutes was not an unreasonable amount of time to detain the defendant and the other occupants of the car while they waited for a K-9 unit to arrive. There is no rigid time constraint on *Terry* stops. *United States v. Sharpe*, 470 U.S. 675, 685 (1985). The lynchpin is "the point reasonably needed to investigate the possible illegal activity." *Ramdihall* 859 F.3d at 88. Under this standard, courts have upheld detentions of eighty-two minutes. *Id*; *see also United States v. McCarthy*, 77 F.3d 522, 531 (1st Cir. 1996) (holding a seventy-five minute stop was reasonable because "[t]here [was] no evidence… of less than diligent behavior on the part of the police.").

Here there is no indication of dalliance on the part of any of the officers involved. Pappas conducted background checks, interviewed the occupants of the car, coordinated a K-9 unit to come when the first was unavailable, determined Eames-Powe had permission to use the car, all while waiting for Stephenson to arrive. There is no evidence or allegation Stephenson was lackadaisical in arriving at the scene. The defendant's professed confusion regarding the order in

10

which Pappas performed these tasks is irrelevant. Once Pappas had called the K-9 unit, it follows he wouldn't simply issue a summons and allow them to continue on their way. At that point, the scope of the investigation had already widened beyond that of the traffic stop based on his reasonable suspicion of additional criminal activity. His duty was to continue investigating and gathering information within the scope of his permissible authority, which he did.

### II. Sgt. Pappas Had Reasonable Suspicion Defendant Might be Armed and Dangerous Due to the Close Link Between Guns and Drugs

Courts have long recognized that traffic stops pose unique dangers to police officers. *See, e.g. Michigan v. Long*, 463 U.S. 1032, 1047 (1983) ("[I]nvestigatory detentions involving suspects in vehicles are especially fraught with danger to police officers.") The Supreme Court has held the Government's "legitimate and weighty interest" in officer safety allows officers to order both drivers and passengers out of the car. *Pennsylvania v. Mimms*, 434 U.S. 106, 110-11 (1977); *Maryland v. Wilson*, 519 U.S. 408, 415 (1997). The Court in *Wilson* explicitly noted the presence of passengers in a car increases the risk to the officer. *Wilson*, 519 U.S. at 414.

Moreover, "the connection between drugs and guns is, of course, legendary." *United States v. Arnott*, 758 F.3d 40, 45 (1st Cir. 2014). It follows that an officer who has reasonable suspicion a vehicle is shuttling drugs also has a reasonable basis to suspect passengers in the car may be armed. In *Arnott*, this Circuit held an officer was justified in conducting a pat-down in the context of a traffic stop when he had reasonable suspicion that a drug transfer had just taken place. *Arnott*, 758 F.3d at 45. More explicitly, the Fourth Circuit has held that during a traffic stop "when the officer has a reasonable suspicion that illegal drugs are in the vehicle, the officer may, in the absence of factors allaying his safety concerns, order the occupants out of the vehicle and pat them down briefly for weapons." *United States v. Sayki*, 160 F.3d 164, 169 (4th Circ.

1998); *see also United States v. Branch*, 537 F.3d 582, 589 (6th Cir. 2008) (holding a pat-down for weapons was reasonable after a K-9 alerted to the presence of narcotics in a vehicle).

      The defendant's conclusory assertion that Pappas had no reasonable basis for suspecting the defendant was armed is absurd. Pappas established a reasonable suspicion there were drugs in the vehicle. A K-9 then alerted to the presence of drugs in the vehicle, giving probable cause to search the vehicle. To do so, Pappas had to remove its occupants, putting himself in potential danger. Those facts alone constitute an objective basis to suspect the defendant may be armed and provide grounds to perform a pat-down. But Pappas had additional knowledge that would amplify his concern for his personal safety. Eames-Powe was clearly cautious and afraid of the defendant, who had either forced her to sleep in her car while in New York or posed such a significant threat (the innuendoes she mentioned) that she would *prefer* to sleep in the car in New York City rather than risk asking to sleep in his apartment. Eames-Powe likewise had to steal money for food from the defendant to feed herself and begged Pappas not to tell the defendant. To suggest Pappas lacked the ability to perform a brief pat-down to ensure his safety and that of his fellow officers in these circumstances both contravenes the law and intolerably assaults necessary protections for law enforcement officers. The defendant essentially argues police officers confronted with potential drug traffickers have no legal power to ensure there are no hidden weapons.

      Notably, a brief frisk for weapons is precisely what Pappas did. His first move was to go to the defendant's waist area, as his training and experiences provided, the likeliest place for a weapon to be. Upon briefly patting the defendant's waist, the block of crack cocaine was immediately apparent. The fact that Pappas was checking for weapons but found drugs instead

does not prevent the introduction of the drugs into evidence as he discovered them within the permissible confines of a *Terry* search. *Minnesota v. Dickerson*, 508 U.S. 366, 375-76 (1993).

The defendant further challenges the basis of the pat-down, arguing the K-9 did not alert. It is not clear on what grounds the defendant has to make that assertion. He does not draw on any authority. He relies solely on his interpretation of the dash cam footage. Unlike Stephenson, the defendant is not trained nor certified as a K-9 handler. The K-9 leapt onto the driver's side passenger window and pulled his ears back, which Stephenson immediately and unequivocally interpreted as an alert.

Lastly, the defendant argues his consent to the pat-down is at best ambiguous. Pappas asked "Do you mind if I pat you down?" The defendant responded "Yes." Pappas clarified, asking "You don't mind?" The defendant responded "Yes." Everything about the defendant's behavior and lack of objection, from the video, appears to support that he intended to communicate he consented to the pat-down. Darcy, who witnessed the exchange, understood it as conferring consent. (Darcy Continuing Report ¶ 6). However, the verbal exchange is admittedly not the epitome of clarity. But because Pappas already had the ability to conduct a pat-down search regardless of whether the defendant consented, this Court need not parse the syntax to conclude the pat-down was permissible.

## **Conclusion**

For the aforementioned reasons, the Government respectfully requests this Court deny the Defendant's Motion to Suppress Evidence.

Date: July 20, 2020

                                                   Halsey B. Frank
                                                   United States Attorney

                                                   /s/Meghan E. Connelly
                                                   Assistant United States Attorney
                                                   United States Attorney's Office
                                                   100 Middle Street
                                                   Portland, ME 04101
                                                   (207) 780-3257
                                                   meghan.connelly@usdoj.gov

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

**CERTIFICATE OF SERVICE**

  I hereby certify that on July 20, 2020, I electronically filed the Government's Opposition to the Defendant's Motion to Suppress with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the attorney of record, Heather Gonzalez.

                Halsey B. Frank
                United States Attorney

                /s/ Meghan E. Connelly
                Meghan E. Connelly
                Assistant United States Attorney
                U.S. Attorney's Office
                100 Middle Street Plaza, East Tower
                Portland, ME  04101
                meghan.connelly@usdoj.gov