UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Docket No. 2:20-cr-41-JDL |
| ) | |
| v. ) | |
| ) | |
| ANTRON OWENS ) | |

**DEFENDANT'S REPLY TO THE GOVERNMENT'S
OPPOSITION TO MOTION TO SUPPRESS**

Now comes the defendant, by and through counsel, and submits this Reply to the Governments Opposition to Defendant's Motion to Suppress. In its Opposition, the Government claims that the extended scope and duration of the stop was justified by reasonable suspicion and that the officers acted diligently. The Government also claims that because the officers suspected drug activity, the frisk of Defendant over an hour after the initial stop was justified. The Government's Opposition features both factual and legal flaws, each of which individually, but most certainly in combination, defeats its defense of defendant's *de facto* arrest and illegal search on October 29, 2019. This Reply addresses each below:

**I.   THE GOVERNMENT'S RELIANCE ON FACTUAL
MISCHARACTERIZATIONS AND HYPERBOLE TO JUSTIFY THE
ILLEGAL SEIZURE AND PAT-DOWN FAILS.**

The facts of the illegal seizure at issue in this case are best understood through a detailed viewing of the video recordings that were made by Trooper Pappas' cruiser camera and Trooper Darcy's cruiser camera. When both videos are reviewed, the court will be afforded the best camera angels, the best audio capture, and the most comprehensive view of events. Not only do these two

1

videos offer the most direct visual images afforded, but also the clearest contemporaneous audio recordings of the actions and statements of the participants and the totality of the circumstances. Reviewing the "whole picture"[1] as depicted in the videos will lead to the conclusion that the officers' actions at 3:15 a.m. on October 29, 2019 were entirely unjustified under the Fourth Amendment. Ironically, the Government claims that "defendant's attempts to explain away some individual factors fall flat," (Opp. at 9), but that is precisely the approach taken by the Government in defense of Pappas' actions. Indeed, the Government ignores the totality of the circumstances and the context from which facts were gleaned when it juxtaposes the following facts to justify calling for a K-9 unit seven minutes into the stop, asking intrusive questions, and detaining the occupants of the vehicle for thirty-nine minutes waiting for the K-9 to arrive:

> The car failed to pull over properly. The owner of the car was not present. Two of the three occupants, including the driver Eames-Powe, were unable to provide identification. The other occupant attempted to sleep through a traffic stop. Eames-Powe appeared anxious, disheveled, and exhibited erratic and increasingly panicked behavior. There were three items in the car (Q-tip, the baggie, and the plate) that could be associated with opiate use, one of which (the baggie) Eames-Powe furtively tucked out of sight. Eames-Powe could not name where in New York she had stayed and only knew the other occupants through "a friend." Eames-Powe and the defendant had been involved in drug-related activity in the past. The defendant radically altered his behavior from the previous encounter in the summer of 2019, and was now cooperating.

(Opp. at 8-9). Now, the whole picture:

*"The car failed to pull over properly"* versus the objective facts on the video:

The stop was initiated at 3:15 in the morning on the Maine Turnpike near mile marker 23 (Wells/Kennebunk) in the rain. The driver was exhausted from traveling all evening from New

---

[1] The court must assess the presence of reasonable suspicion "in a commonsense, case-by-case way, taking in the whole picture." *United States v. Dion*, 859 F.3d 114, 124 (1st Cir. 2017) (quoting *United States v. McGregor*, 650 F.3d 813, 821 (1st Cir. 2011)).

York.[2]  The passenger in the back seat was sleeping.  When emergency lights and sirens were suddenly powered on behind her, she was traveling in the far left lane of the turnpike.  The driver immediately pulled over to the left, instead of crossing two lanes of traffic to pull over on the right side. The driver later explained to Pappas that she thought she was supposed to pull over on the side closest to where she was driving.  When signaled to drive over to the right side of the highway, she did so.  Promptly and unremarkably.  When Pappas encountered the driver, any possible suspicion of impairment was clearly dispelled because he took no steps whatsoever to investigate a potentially impaired driver.  As the video shows, the driver was alert and spoke directly, clearly and coherently in answer to Pappas' questions.  When she exited her vehicle, she exhibited no signs of impairment.  The Government's suggestion that the driver's confusion is suggestive of criminal activity is belied by the totality of these circumstances.

*"The owner of the car was not present"* versus the objective facts on the video:

The driver explained that it was her boyfriend's car and she was living in it.  Pappas said to the driver, "Why do you live in your car?" She replied, "We just got kicked out because of a cockroach infestation, I refused to pay rent."  Pappas asked, "Where at?"  The driver replied, "Bangor, Maxim Court, right off of Third Street," and added, "I'm not kidding when I say I live in my car. My boyfriend has our summer home, which is a RAV 4 which doesn't drive very well." Her explanation was clearly corroborated by the rear storage area which was full of her personal belongings.  The Government appears to suggest that because the driver was not the registered owner, then her use of someone else's car is akin to how drug traffickers rent cars to avoid detection

---

[2] On the video, the driver states that she is "so tired" (@14:00) and had been driving since 9:30 the prior evening (@44:45).

3

or forfeiture. However, given the totality of circumstances underlying the reason why the driver was operating her boyfriend's car, comparison to evasive trafficking techniques is inapt.

*"Two of the three occupants, including the driver Eames-Powe, were unable to provide identification"* versus the objective facts on the video:

Lacking identification is not suspicious. Giving false identifying information is a different situation, but such was not the case here. All three occupants were fully cooperative. Both Defendant and the driver were immediately forthcoming with their real names and dates of birth, which were verified by Pappas. In his own words, Pappas described Defendant Owens as "following all instruction as a modeled citizen [sic]."

*"The other occupant attempted to sleep through a traffic stop"* versus the objective facts on the video:

The stop occurred at 3:15 in the morning. Sleeping in the middle of the night on a long road trip is to be expected and is anything but suspicious. And the fact that he was laying down at the beginning of the stop and did not make any furtive movements reflects his lack of panic or concern about the police interaction, not consciousness of guilt. Suspicion cannot be drawn from the totality of these circumstances.

*"Eames-Powe appeared anxious, disheveled, and exhibited erratic and increasingly panicked behavior"* versus the objective facts on the video:

The video reflects nothing unusual about the driver's demeanor or appearance.[3] If anxiety about being stopped by a police officer is suspicious, then a K-9 unit could be justified in nearly

---

[3] The Government's citation to *Dion*, 859 F.3d at 127 is unpersuasive. In *Dion*, the defendant was so nervous that the officer could see his carotid artery pounding and his pulse beating in the area of his stomach underneath his shirt. *Id.* at 119.

4

every stop. If being disheveled at 3:15 a.m. on the side of the highway in the rain after a long-road trip in a car in which you are living because you are poor and homeless is suspicious, then poverty is a basis to suspect criminality. The Court should reject a woman's appearance in this context as a factor of suspicion. And the video belies the Government's contention that the driver was erratic and increasingly panicking. That assertion is simply false.

*"There were three items in the car (Q-tip, the baggie, and the plate) that could be associated with opiate use, one of which (the baggie) Eames-Powe furtively tucked out of sight"* versus the objective facts on the video:

Pappas observed a plate in the trunk/rear storage area, an intact q-tip laying near a cup holder in the center console and an empty sandwich baggie. The totality of circumstances merited no reasonable suspicion of criminal activity. First, neither the driver nor the passengers exhibited signs of impairment from recent drug use. Second, the driver was camping out in her car. The rear storage area was stuffed full of bags with her belongings, including her wallet. A perfectly clean plate with no residue of any kind was in the trunk with her belongings. A plate is a common household item that one would expect to see if someone is camping out in their vehicle. Had she not been living in her car and had there been residue of some kind on the plate, then that might merit legitimate suspicion, but those were not the circumstances.

The Q-tip is a common personal hygiene item. In the drug context, the cotton ends of Q-tips are <u>removed</u> and used as a filter after a drug has been cooked in a spoon. It is dropped into the bowl of the spoon to strain the liquid and weed out any impurities that have not melted. The needle and syringe then extract the liquid through the cotton filter to inject.[4] The Q-tip observed was intact.

---

[4] https://www.verywellmind.com/drug-paraphernalia-photo-gallery-4020396

There was no indication it had been used to filter drugs and Pappas did not observe any paraphernalia that would have been used along with the cotton for injecting drugs, such as a lighter, a spoon, a syringe or tin foil.  The Q-tip was innocuous.

Sandwich baggies hold food, thus the name.  In the drug context, dealers will fill a corner of a sandwich baggie, twist it, tie it and cut off the remainder of the bag.  This was not the condition of the baggie observed in the driver's wallet. This was the baggie:



It was empty and entirely intact.  And only a single baggie was observed.  Drug dealers are typically found with an entire box or wad of sandwich baggies. Such was not the case here. Furthermore, the video reflects no furtive actions by the driver to conceal the baggie.[5]  She was holding her wallet

---

[5] The Government's citation to *United States v. Ramdihall*, 859 F.3d 80, 92 (1st Cir. 2017) is unpersuasive. First, *Ramdihall* involved a 6-minute detention waiting for a K-9 following the issuance of the traffic ticket. Second, it wasn't the baggie that the court found suspicious, but the manner in which Ramdihall appeared to surreptitiously conceal the plastic baggie by slamming the center console shut and multiple other factors that gave rise to reasonable suspicion "when considered in light of the other evidence that raised doubts about Ramdihall's story concerning his travel plans. And though the question may be close, Ramdihall does not offer a persuasive account of why, in combination, the facts available in the record render such a conclusion mistaken."

under the light of Pappas' flashlight. She pulled it out of her wallet as she was looking for her i.d. and Pappas asked her about it. She did not turn away from him or immediately try to conceal it. She did not snap her wallet shut. She continued to stand in front of him, holding it and her wallet under his flashlight while she looked for her i.d. and assured Pappas it was empty, which it was. She then tossed it amongst her belongings in the trunk. She explained that it contained carrots earlier in the day and she had not wanted to litter so she put it in her wallet. She made no attempt to tuck the baggie out of sight. In sum, the plate, the q-tip and the baggie engendered no suspicion in the totality of these circumstances.

*"Eames-Powe could not name where in New York she had stayed and only knew the other occupants through 'a friend'"* versus the objective facts on the video:

The driver was clearly not a sophisticated traveler. She was homeless and poor. She told Pappas she was bad with directions. Furthermore, her description of the trip was entirely consistent with the statements of her passengers who were separated from her when she explained the trip to Pappas. The men had no idea what she told Pappas and they had no ability to square their stories with hers. This was not a situation in which the individuals were being deceitful or dodgy about their travel agenda to avoid suspicion, as in other cases.[6] Everyone was forthcoming and statements were consistent. Suspicion cannot be justified by <u>consistent</u> explanations about the trip.

Furthermore, the Government's suggestion that knowing someone "through a friend" justifies suspicion of criminal activity is nonsensical. The Court should reject this as a factor.

---

[6] Compare *Dion*, 859 F.3d at 118 (driver with Colorado plates stopped in Kansas claimed he was traveling from Pennsylvania where he had met with his certified public accountant and was returning home to Arizona); *Ramdihall*, 859 F.3d at 91 (Ramdihall was from New York, Hillaire was from California, and they offered a dubious explanation for why they were en route to Columbus, Ohio).

*"Eames-Powe and the defendant had been involved in drug-related activity in the past"*

versus the objective facts on the video:

First, the Government's contention that Pappas was aware of Defendant's past "drug related activity" when he called for the K-9 is false. Trooper Darcy had not provided Defendant's name and date of birth to Pappas yet, and therefore, he had no ability to run Defendant's name or review his criminal history. Furthermore, had he done so, he would have learned that Defendant has no criminal history involving drugs and only has a total of two convictions in his past.

Moreover, the driver was entirely direct about a prior drug conviction from a decade prior and that she had not been in trouble since.[7] She advised that she now worked with the elderly. Her exchange with Pappas was as follows:

> Pappas: Have you been arrested before?
> Driver: Yeah
> Pappas: What for?
> Driver: It was like 8 or 10 years ago and it was for drugs. Oxycodone. It was all personal use, but um there was more than one, so it was trafficking.
> Pappas: Did you do prison time?
> Driver: Yep
> Pappas: How long?
> Driver: Uh, 14 months altogether. I haven't been in trouble since.

The driver also emptied her pockets as directed and nothing suspicious was observed.

Although the Government claims that Pappas recognized Defendant from a traffic stop in June of 2019, neither Defendant nor the driver of the stopped vehicle were arrested or charged with anything but a speeding ticket, despite the fact that officers tore the vehicle apart in a manic search

---

[7] The Government's citation to *Dion*, 859 F.3d at 127 is unpersuasive. In *Dion*, it was significant to the court that "Dion misrepresented the extent of his criminal history by omitting that he had been on the hook not just for possession, but also trafficking, and that he had been caught up not just in marijuana, but also cocaine." *Id.* at 128. That was not at all the situation in this case.

for contraband because they smelled marijuana. What they did find was cash in the center console, but it was not Defendant's car, nor was he operating it. That previous stop hardly qualifies as "drug related activity." Nevertheless, the Government asks the court to infer that because Defendant is black, wears dreadlocks, was traveling south in a car with New Jersey plates with a black driver who had cash, that he must be involved in illegal drugs. <u>That</u> is racial profiling, not reasonable suspicion.

*"The defendant radically altered his behavior from the previous encounter in the summer of 2019, and was now cooperating"* versus the objective facts on the video:

Arguing that Defendant's cooperative demeanor merited suspicion of criminal activity because he was allegedly uncooperative during a vehicle stop in June is unpersuasive. Again, during the June stop, the officers ransacked the vehicle and found no contraband: no drugs, no paraphernalia, nothing. Defendant's purported attitude during a baseless search that revealed nothing remarkable cannot be surprising. Nor was his cooperative behavior the basis for reasonable suspicion during the stop in question, which was in the middle of a rainy night on the side of the highway with three officers present for an expired registration. Defendant and his cousin are black men and given how these kinds of stops can turn out for black men, cooperating with the officers was a necessity for their safety. Defendant was being smart, not suspicious.

In sum, the Government's attempt to reverse-engineer this illegal seizure to comport with the Fourth Amendment fails in the face of the objective facts as captured on video. It is patently clear that Pappas had no intention of releasing these individuals before he could search them and the vehicle, no matter how they behaved, no matter how consistent their answers, no matter what Pappas observed that corroborated their stories. The fact is that Pappas observed a Caucasian female with two black passengers and assumed they were criminals because Defendant had the audacity of

driving in a car with cash in the console several months prior. Nothing was going to dispel his hunch. In this case, he might have guessed right, but the Fourth Amendment is not meant to reward racially profiled "hunches"; instead, the Fourth Amendment protects us against illegal searches and seizures, like the one in this case. The Constitution is not a technicality. Bottom line, given the totality of circumstances and the objective facts as captured on video, the Government's purportedly suspicious facts do not justify the unlawful seizure in this case.

And finally, regarding the pat-down of Defendant, there was simply no reasonable basis to believe that he was armed and dangerous, nor were any officers afraid for their safety. No weapons were present during the prior stop when he was a passenger in June. Defendant was cooperative, not aggressive or threatening. He did not appear nervous. He made no furtive movements. The officers let him sit in the car for twenty minutes <u>after</u> the K-9 allegedly alerted before ordering him out. Four officers were present.

The Government cites a Fourth Circuit opinion from 1998, *United States v. Sayki*, 160 F.3d 164 (4th Cir. 1998), and a Sixth Circuit opinion from 2008, *United States v. Branch*, 537 F.3d 582 (6th Cir. 2008), for authority to condone a pat-down of a passenger based on suspicion that drugs are in the vehicle, but this is not the law in the First Circuit. Moreover the District of Massachusetts rejected this reasoning in *United States v. Alix*, 630 F. Supp. 2d 145, 157 (D. Mass. 2009) ("The only information that [the officer] had here was that this was a narcotics investigation and the passenger seemed nervous. That surely was not enough to suggest that the defendants were carrying a weapon.").[8] Furthermore, when officers are not actually concerned for their safety, the Fourth

---

[8] Even when police have probable cause to search a car for contraband, their authority to search the car does not extend to the search of a person found in that automobile. *United States v. Starks,* 301 F. Supp. 2d 76, 86 (D. Mass. 2004) (internal citations omitted).

Amendment does not permit a pat-down. *United States v. Starks*, 301 F. Supp. 2d 76, 85 (D. Mass. 2004) (citing *United States v. Lott,* 870 F.2d 778, 783-84 (1st Cir. 1989)).

There is no mention in any of the officers' reports in this case that any of them feared for their safety or the safety of the others, nor do their actions reflect safety concerns.  Further, the Government's suggestion that the driver was afraid of the Defendant is contradicted by the video and common sense. There was simply no factual or legal basis to frisk Defendant.

## II.  SETTING ASIDE THE LACK OF REASONABLE SUSPICION TO EXPAND THE STOP BEYOND THE MISSION OF THE TRAFFIC INFRACTIONS, THE GOVERNMENT'S LEGAL ANALYSIS FAILS.

The crux of the Government's defense of the extended detention and *de facto* arrest is best understood in one sentence:

> ***Once Pappas had called the K-9 unit, it follows he wouldn't simply issue a summons and allow them to continue on their way.***

(Opp. at 11) (emphasis added).  This, however, is not the law and that is why the Government's position fails.  There is no authority whatsoever that permits an indefinite detention of a vehicle as long as a K-9 unit is called. Rejecting this notion, the District of Massachusetts said it well:

> Candidly, most of the opinions involving time and duration challenges to car stops sustain the actions of the police under various rationale, but there must be limits. One can pretend that the stop is justified as a traffic stop, so long as the car was actually violating the law. One can do what is necessary to learn about the occupants during the stop -- questioning, asking for documentation -- so long as one acts consistent with the limited information he has. What one cannot do is carry the stop beyond its rationale. Otherwise, more than the traffic stop rationale would be illusory; Fourth Amendment protection would be, as well.

*Alix*, 630 F. Supp. at 158.

Contrary to the Government's position, an officer may only prolong a traffic stop to investigate developing suspicion for a "relatively brief" period of time. *United States v. Favreau*, 886 F.3d 27, 30-31 (1st Cir. 2018). (prolonging a stop by three minutes is sufficiently brief and reasonable); *United*

11

*States v. Pontoo*, 666 F.3d 20, 31 (1st Cir. 2011) (prolonging the stop by less than a minute does not "exceed the bounds of *Terry*."); *United States v. Sharpe*, 470 U.S. 675, 683 (1985) (twenty minute detention reasonable when the officer is diligently pursuing his investigation and defendant's actions contributed to the delay); *Fla. v. Royer*, 460 U.S. 491, 501-506 (1983) (holding a 90-minute detention in an airport interrogation room to be an unreasonable length of time to confirm suspicions). The length of delay is measured starting at the end of the initial period of detention relating to the traffic stop and ends when probable cause to search is attained. *Favreau*, 886 F.3d at 30.

In this case, eight minutes into the stop, Pappas had acquired the information necessary to confirm everyone's identity, confirm the vehicle was not reported stolen, and confirm no one had any pending warrants. Dispatch reported to him that a K-9 unit was not responding. There was nothing left to do but complete the mission of issuing the traffic tickets. Without question, that should have been the end of the stop.[9] But it's clear that Pappas intended to detain these individuals until he could develop a basis to search them and their vehicle for drugs. Having no basis to do so, he held them captive and continued to ask intrusive questions unrelated to the traffic violation. He also waited ten minutes to call Officer Stephenson after dispatch informed him that the K-9 unit they tried to reach was unresponsive. Finally, Pappas never bothered to write out or print off the traffic citations, for doing so would have created a clear line of demarcation between the time to complete

---

[9] In a 2015 Police Public Contact Survey (PPCS) conducted by the Bureau of Justice Statistics concerning the nature and characteristics of face-to-face contact between police and the public, the average duration of 14,331 contacts initiated by private citizens was 14.8 minutes. United States Department of Justice. Office of Justice Programs. Bureau of Justice Statistics. Police-Public Contact Survey, 2015. Ann Arbor, MI: Inter-university Consortium for Political and Social Research [distributor], 2018-04-11. https://doi.org/10.3886/ICPSR36653.v1. While this study is not directly on point, it provides a benchmark concerning the average duration of citizen-police contact.

the mission of the stop and the extended duration thereafter.  This omission is telling.  This Court cannot condone such disregard of the Constitution.

Wherefore, Defendant Owens moves this Honorable Court to suppress at trial all evidence of any kind secured as a result of the illegal seizure and nonconsensual search of Defendant on October 29, 2019.

Dated: August 3, 2020　　　　　　　　　　　　　　　　/s/ Heather Gonzales
　　　　　　　　　　　　　　　　　　　　　　　　　Heather Gonzales
　　　　　　　　　　　　　　　　　　　　　　　　　Assistant Federal Public Defender
　　　　　　　　　　　　　　　　　　　　　　　　　Counsel for the Defendant
　　　　　　　　　　　　　　　　　　　　　　　　　P.O. Box 595
　　　　　　　　　　　　　　　　　　　　　　　　　Portland, Me 04112-0595
　　　　　　　　　　　　　　　　　　　　　　　　　207-553-7070

## CERTIFICATE OF SERVICE

I, Heather Gonzales, hereby certify that I have caused on this date the within Reply to be served upon Assistant United States Attorney Meghan Connelly, Esq., by forwarding a copy to her via the Court's ECF System.

Dated: August 3, 2020　　　　　　　　　　　　　　　　/s/ Heather Gonzales
　　　　　　　　　　　　　　　　　　　　　　　　　Heather Gonzales, Esq.
　　　　　　　　　　　　　　　　　　　　　　　　　Counsel for the Defendant