## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| | ) |
| v. | ) 2:20-cr-00041-JDL |
| | ) |
| ANTRON OWENS, | ) |
| | ) |
| Defendant. | ) |

## ORDER ON DEFENDANT'S MOTION TO SUPPRESS

On March 13, 2020, Antron Owens was indicted on one count of possession with intent to distribute cocaine base, in violation of 21 U.S.C.A. § 841(a)(1), (b)(1)(B) (West 2021) (ECF No. 23). Owens has moved to suppress the introduction at trial of all evidence obtained as a result of a traffic stop of a car in which Owens was a passenger, conducted by state police on October 29, 2019 (ECF No. 32). He contends that the stop should have concluded after approximately eight and a half minutes with the issuance of a traffic citation to the car's driver. Instead, the stop lasted for an additional thirty-eight minutes, at which point a canine sniff of the car resulted in a positive alert for the presence of drugs. On April 21, 2021, I conducted an evidentiary hearing by videoconference (ECF No. 65). For the reasons that follow, I grant the motion to suppress.

## I. FACTUAL BACKGROUND

The October 2019 traffic stop was initiated and conducted primarily by Maine State Police Sergeant Thomas Pappas, who had participated in a previous traffic stop

in June 2019 of a vehicle in which Owens was also a passenger.  Because it is relevant to my analysis of the October stop, I begin with the June stop.

## A.    The June 2019 Stop

On June 27, 2019, a Maine State Police trooper stopped a car bearing New Jersey license plates heading south on the Maine Turnpike near York.  Owens was a passenger in the car, and another man was driving.  Both men were Black.[1]  Initially, the trooper told the driver that he had pulled the car over for speeding in a construction zone.  Def.'s Ex. 1 at 1:50.  After obtaining the driver's information, the trooper asked Owens for his identification.  Owens asked the trooper why he needed his ID, and the trooper responded that the occupants were "smoking marijuana in the car."  *Id.* at 2:25-2:30.  The driver and Owens protested this assertion, and the driver asked if Owens could record the stop on his cell phone, *id.* at 2:33, but the trooper said that Owens's recording was unnecessary because the trooper's camera and microphone were on and the stop was being recorded, *id.* at 2:40-2:45.  The driver then told Owens to "put it [the cell phone] on," because he "want[ed] this recorded."  *Id.* at 2:46.  The trooper said that he didn't know why the driver was "giving [him] such a hard time," *id.* at 2:51, and directed the driver to get out of the car for field sobriety tests, *id.* at 3:20.  When the driver refused, the trooper returned to his cruiser

---

[1] In his reply memorandum, Owens asserts that the June 2019 stop resulted from, and was shaped by, improper racial profiling:  "[T]he Government asks the court to infer that because Defendant is black, wears dreadlocks, was traveling south in a car with New Jersey plates with a black driver who had cash, that he must be involved in illegal drugs. That is racial profiling, not reasonable suspicion."  ECF No. 39 at 9.  Owens's counsel did not question Sergeant Pappas regarding racial profiling, nor was it otherwise raised during the suppression hearing.  For that reason, I treat it as abandoned and do not address it further.

and called for backup. Ultimately, Owens recorded much of the stop with his cell phone.

After the driver exited the vehicle, he was administered field sobriety tests, which he passed without incident, but the trooper, now assisted by other troopers who had arrived on the scene, including Sergeant Pappas, handcuffed the driver and proceeded to search the car. Although Sergeant Pappas testified at the evidentiary hearing that the search was prompted by a positive dog sniff on the car, no dog sniff was ever conducted, as the Government conceded following the hearing. To effectuate the search, the troopers removed Owens from the car and frisked him, and the trooper who had initiated the stop (the "lead trooper") told the other troopers that Owens had "been recording this whole time." *Id.* at 21:15. During the search, Sergeant Pappas stood near Owens on the side of the road. In the course of the search, the troopers found about $5,000 in cash in the car.

After additional questioning, the lead trooper issued the driver a ticket for speeding. As Owens and the driver prepared to leave, the driver made a remark—which is inaudible from the lead trooper's microphone and in the dashcam video of the stop—that the troopers interpreted as an accusation that the troopers had taken some of the cash. *Id.* at 48:43. In response to the remark, Sergeant Pappas ordered the driver to get out of the car and count the money. *Id.* at 48:49. The driver complied, and after he finished counting the money, the stop ended and the troopers went on their way. Although Sergeant Pappas testified that it was Owens who challenged the troopers about the cash, it was the driver who voiced the challenge, as the Government conceded following the hearing.

The troopers' comments throughout the stop, both to one another and to Owens and his companion, reflect that the troopers suspected that the driver and Owens were drug dealers who had sold drugs in Maine and would return again for the same purpose. For example, the lead trooper said to another trooper, "They [referring to Owens and the driver] just spent a couple days up here selling stuff," although the troopers had found no evidence to support that assertion. *Id.* at 24:25. Also, the lead trooper said to Owens, "We get it man, there's a good market here, make a lot of money here," *id.* at 31:27; and "It's nothing personal, man, you guys came up, you made a couple grand, you got away with it this time," *id.* at 31:50.

## B. The October 2019 Stop

A few months later, on October 29, 2019, Sergeant Pappas was on patrol on the Maine Turnpike when he noticed a black Kia Soul traveling northbound near Wells. It was 3:15 a.m. and raining, and the car initially drew Sergeant Pappas's attention because it was following a tractor-trailer in the middle lane at an unsafely close distance, given the nighttime and weather conditions. Sergeant Pappas ran the car's license plate and learned that the registration had expired several months earlier and that the car had not been reported stolen. He turned on his police cruiser's emergency lights, and the car pulled over onto the left shoulder of the northbound travel lanes—that is, onto the shoulder of the median, rather than the right shoulder of the travel lanes. Sergeant Pappas pulled over to the right shoulder, and at his

verbal direction over his cruiser's loudspeaker, the driver safely crossed the highway and stopped in front of Sergeant Pappas's cruiser.  Gov't's Ex. 1 at 2:25.[2]

Sergeant Pappas approached the passenger side of the car and met the occupants.  *Id.* at 3:00.  In addition to the driver, a white woman, Owens was seated in the front passenger seat, and there was another Black man lying down in the backseat.  Sergeant Pappas recognized Owens from the June stop.  In addition, Sergeant Pappas testified that the rear passenger was sleeping when he approached the car, which Sergeant Pappas viewed as suspicious.  Sergeant Pappas also observed an intact, unused Q-tip resting on the car's center console.  Sergeant Pappas testified that the driver did not appear impaired.

Sergeant Pappas asked the driver for her driver's license, registration, and proof of insurance.  *Id.* at 3:13.  She produced an insurance card but did not have her license in the front of the car with her, and said that she had to retrieve it from the rear cargo area.  *Id.* at 3:15.  Sergeant Pappas also asked the rear passenger for his identification because he was not wearing a seatbelt, *id.* at 3:26-3:32, and the rear passenger produced his driver's license, *id.* at 4:12, 7:00.  Sergeant Pappas asked Owens for his ID as well, *id.* at 3:55; Owens said that he did not have his ID, but he told Sergeant Pappas his name, *id.* at 4:51.  The driver also told Pappas that the car was not hers, but belonged to her boyfriend and his stepfather.  *Id.* at 4:41.

---

[2] "A lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009).  For purposes of the timeline in this case, I treat the moment that the Kia crossed the highway to pull onto the right shoulder in front of Sergeant Pappas's cruiser, rather than the moment that the car originally stopped on the median or the moment that Sergeant Pappas approached the car on foot, as the commencement of the stop.

Sergeant Pappas accompanied the driver to the rear of the car to look for her license in the trunk, which was packed with her belongings. As the driver searched for her license, she explained that she had been living in the car for a few weeks. *Id.* at 6:12. Sergeant Pappas noticed an empty, intact, plastic sandwich baggie in her wallet. *Id.* at 6:32. He asked the driver about the baggie, and she responded that it had held celery sticks that she had eaten earlier that day. *Id.* at 6:36. Sergeant Pappas also noticed a single, clean plate in the trunk. As I will explain, the Q-tip, baggie, and plate figured prominently in Sergeant Pappas's conclusion that criminal activity was afoot. Sergeant Pappas testified that it was at this point that his attention turned to conducting a drug investigation:

> Q. Sergeant Pappas, when did you believe the traffic stop moved into a drug investigation?
>
> A. The traffic stop moved into a drug investigation and I developed more than enough reasonable articulable suspicion to hold the vehicle and continue an investigation outside the scope of the initial traffic stop when – at the point when I was at the rear of the vehicle when [the driver] opened up the car, the rear hatch, she was searching for her license, her behavior became increasingly nervous, she herself admitted that she was nervous. I saw the bag. I saw the plate, coupled with every other thing that I testified to, I believed that there was nefarious behavior in this specific case, most likely drug distribution going on.

ECF No. 72 at 58.

The driver was ultimately unable to find her license, and about five minutes and twenty seconds after the car had pulled over to the right shoulder, Sergeant Pappas returned to his cruiser and directed the driver to stand outside the cruiser's passenger-side window to answer questions. Gov't Ex. 1 at 7:00. Another trooper

arrived on the scene while the driver was searching for her license, and he spoke to Owens and the other passenger, who remained in the Kia while Sergeant Pappas was with the driver. All three occupants were calm and polite throughout the stop.

When a driver is unable to produce a driver's license, Maine State Police can verify the driver's identity and authorization to operate the vehicle by checking their name and date of birth against a database, which is what Sergeant Pappas did when he returned to his cruiser. While he was checking the driver's information—a process that was complicated somewhat by the driver's hyphenated surname—he asked her where she was coming from. *Id.* at 8:26. She responded, "New York," but she could not name the location within New York, explaining that she was "horrible with directions in New York." *Id.* at 8:31. Sergeant Pappas asked the driver if she had ever been arrested,[3] and she told him that she had been convicted of a drug-related crime "eight or ten years" earlier. ECF No. 72 at 30; *see* Gov't's Ex. 1 at 9:04. She told him that she had spent fourteen months in prison for the offense. Gov't's Ex. 1 at 9:17. Sergeant Pappas asked the driver how she knew Owens and the other passenger; she responded that she had met them through a friend at an apartment complex in Bangor where she used to live. *Id.* at 9:20.

About eight and a half minutes into the stop, Sergeant Pappas received electronic confirmation that the driver had a valid Maine driver's license. *Id.* at 10:50. However, having decided to undertake a drug investigation before he received

---

[3] Sergeant Pappas testified that, as he was running the driver's name through a series of state databases, he "got a felony hit" on the driver. ECF No. 72 at 30. Although he did not specifically testify that this information prompted his question to the driver, it is reasonable to think that it did. He also testified that, at that time, he knew nothing about her criminal history apart from the fact that she had previously been convicted of a felony.

confirmation of the driver's identification, he called into dispatch to request a K-9 unit; he made that first call just under eight minutes into the stop. *Id.* at 10:00-10:05. There were no Maine State Police K-9 units available in the area, so Sergeant Pappas began calling other local police departments to find an available K-9 unit. By about twenty minutes into the stop, a K-9 unit was on its way from South Portland. *Id.* at 22:42.

After Sergeant Pappas received confirmation of the driver's identity and license, he did not proceed to issue her a citation, but instead continued to intermittently question her, while also making calls in search of an available K-9 unit. Two and a half minutes after he confirmed the driver's identity, he asked her if she had "just picked these people up," *id.* at 13:31, and the driver responded that she and Owens had picked up the rear-seat passenger, Owens's cousin. *Id.* at 13:40. She said that the cousin was "coming to stay with us," and referred to him using the nickname "Raul." *Id.* at 13:40-13:45. When Sergeant Pappas asked who "Raul" was, the driver chuckled and said, "Not the name that's on the license." *Id.* at 13:50. She said, "You know how they are with their nicknames." *Id.* at 13:54. She also referred to Owens using a nickname. *Id.* at 16:48. A few minutes later, when Sergeant Pappas asked her if she knew the passengers' names, she replied, "Well yeah, I do, but only what they tell you; that's how most African-Americans are, that are in Bangor, Maine." *Id.* at 17:50-17:56.

The driver told Sergeant Pappas that she and Owens had driven down from the apartment complex in Bangor to pick up Owens's cousin, because Owens had been "looking for a ride" and she had not "had much going on lately." *Id.* at 15:15-15:35.

She said that they had been in New York for "three or four days," visiting Owens's family, *id*. at 15:40, and that she "didn't want to impede much on the whole family thing, though, so [she] stayed in the car," *id*. at 15:50. When Sergeant Pappas asked her, "You slept in the car while you went down to New York?" the driver answered, "I *sleep* in the car. That's my life." *Id*. at 15:53-15:58. She later told Sergeant Pappas that she did not like to ask for things, *id*. at 17:08, but said that she had taken the toll money that Owens had put in the center console to buy a sandwich earlier that day, *id*. at 17:14.

Once the K-9 unit was on its way, about twenty minutes into the stop, Sergeant Pappas went back to the Kia to speak to the passengers himself. He asked them about their itinerary and relationship with the driver, and their responses were consistent with the driver's descriptions. He also responded to their questions about the reason for the stop, explaining that the car's registration was expired and that the police were "trying to deal with that right now." *Id*. at 27:25.

Around thirty-two minutes into the stop, Sergeant Pappas spoke on the phone with an agent from the Maine Drug Enforcement Agency to discuss Owens. *Id*. at 34:45. The phone call was briefly interrupted in order for Sergeant Pappas to speak by phone with the driver's boyfriend, who confirmed that he had given the driver permission to use his car.[4] After speaking with the driver's boyfriend, Sergeant Pappas asked the driver additional, conversational questions, and then waited in

---

[4] Before speaking with the drug enforcement agent, Sergeant Pappas had requested that the driver call her boyfriend so that Sergeant Pappas could speak with him, but the boyfriend did not answer. Gov't's Ex. 1 at 28:00, 29:50. Later, while Sergeant Pappas was on the phone with the drug enforcement agent, the driver's cell phone received a call from the boyfriend's phone number. *Id*. at 36:00-36:30. Sergeant Pappas then called the driver's boyfriend, again from the driver's phone, and spoke with him. *Id*. at 36:50.

silence for the K-9 to arrive. At this point, he still had not issued a citation to the driver for the expired registration. Owens and the other passenger had remained in the Kia throughout the stop.

About forty-six minutes into the stop, the K-9 unit finally arrived and a dog sniff of the Kia was conducted, with Owens and the passenger still seated inside. The dog alerted. After searching and handcuffing the driver, Sergeant Pappas directed Owens to get out of the Kia, told him that he was being detained, and handcuffed him. Sergeant Pappas asked Owens if he could pat him down and, without waiting for an answer, Sergeant Pappas touched Owens's waist. Sergeant Pappas felt and then removed a bag containing what appeared to be cocaine base tucked under the waistband of Owens's pants. Owens was then placed under arrest.

## II. DISCUSSION

Owens moves to suppress all evidence, including any drugs, seized as a result of the October 2019 stop. He does not dispute that Sergeant Pappas legitimately stopped the car for an expired registration. He contends, however, that Sergeant Pappas extended the stop beyond the time necessary to handle the traffic violation while lacking a reasonable suspicion to do so, in violation of the Fourth Amendment as applied in *Rodriguez v. United States*, 575 U.S. 348 (2015). He also argues that even if the extended stop and dog sniff were valid, the police violated his rights by conducting the patdown search of his person.

When, as here, the police conduct a warrantless search, the Government bears the burden to show that the search was constitutional. *See United States v. Acosta-Colon*, 157 F.3d 9, 14 (1st Cir. 1998); *United States v. Longmire*, 761 F.2d 411, 417

(7th Cir. 1985) ("The general federal rule on who bears the burden of proof with respect to an allegedly illegal search or seizure is based upon the warrant-no warrant dichotomy: . . . if the police acted without a warrant, the prosecution bears the burden of establishing legality.").

## A.    Legal Framework

As a general matter, the authority to detain a vehicle "ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez*, 575 U.S. at 354.  Here, Owens does not dispute that the stop was valid at its inception based on the Kia's expired registration.  Instead, he argues that the police lacked a reasonable suspicion to expand the scope and duration of the stop beyond the time required to address the traffic infraction.  The Government disagrees.

"A routine traffic stop is more akin to a *Terry* stop than an arrest." *United States v. Dion*, 859 F.3d 114, 123 (1st Cir. 2017); *see Terry v. Ohio*, 392 U.S. 1 (1968). "Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop . . . and attend to related safety concerns." *Rodriguez*, 575 U.S. at 354 (citations omitted).  "[A]ny action undertaken [by the police] with respect to the stop 'must be reasonably related in scope to the stop itself unless the police have a basis for expanding their investigation.'" *Dion*, 859 F.3d at 124 (quoting *United States v. Ruidíaz*, 529 F.3d 25, 28-29 (1st Cir. 2008)).  And because "a dog sniff is not fairly characterized as part of the officer's traffic mission," *Rodriguez*, 575 U.S. 356, "absent 'the reasonable suspicion ordinarily demanded to justify detaining an individual,' a police officer may not prolong a traffic stop to conduct a K-9 sniff beyond

the time necessary to handle the traffic violation that justified the stop," *United States v. Ramdihall*, 859 F.3d 80, 90 (1st Cir. 2017) (quoting *Rodriguez*, 575 U.S. at 355). However, "reasonable suspicion may . . . develop during the course of an ordinary traffic stop so as to justify extending the seizure beyond the time needed to accomplish its original purpose." *Id.*

For purposes of *Rodriguez*, a stop is unlawfully prolonged "when law enforcement conducts an inquiry about crimes unrelated to the traffic stop and the process adds time to the stop without a reasonable suspicion for the inquiry." *United States v. Morganstern*, --- F. Supp. 3d ---, 2020 WL 7588576, at *6 (D. Me. Dec. 22, 2020) (citing *United States v. Stewart*, 902 F.3d 664, 674 (7th Cir. 2018); *United States v. Clark*, 902 F.3d 404, 410-11 (3d Cir. 2018); *United States v. Bowman*, 884 F.3d 200, 219 (4th Cir. 2018); *United States v. Gomez*, 877 F.3d 76, 88-93 (2d Cir. 2017); *United States v. Gorman*, 859 F.3d 706, 715 (9th Cir. 2017)). In other words, the question is not whether "the overall duration of the stop remains reasonable in relation to the duration of other traffic stops involving similar circumstances." *Rodriguez*, 575 U.S. at 357. Instead, inquiries "unrelated to the traffic violation . . . that prolong or add time to a traffic stop violate the Fourth Amendment absent reasonable suspicion of a separate crime." *Gomez*, 877 F.3d at 90.

Applying *Rodriguez* to this case, the time at which Sergeant Pappas began to prolong—i.e., "add[] time to," 575 U.S. at 357—the stop was the moment that he received confirmation of the driver's identity. Upon his receipt of the confirmation, about eight and a half minutes into the stop, he should reasonably have been able to take steps to complete the stop's traffic-related mission by writing the driver a

citation and completing any other incidentals. However, Sergeant Pappas did not do so.[5] Instead, he continued trying to find an available K-9 unit and asking the driver non-traffic-related questions about her itinerary and relationship with the passengers. In short, he abandoned the traffic-related purpose in pursuit of a drug investigation, detaining the car and its occupants for additional time. By failing to proceed with the traffic mission once he confirmed the driver's Maine license, he prolonged the stop. The crux of the matter, then, is whether Sergeant Pappas had a reasonable suspicion of criminal activity, at the time he confirmed the driver's identity, to justify expanding the stop's mission and duration.

## B.    Reasonable Suspicion of Criminal Activity

"The level of suspicion the reasonable suspicion standard requires is . . . less than is necessary for probable cause." *Ramdihall*, 859 F.3d at 90 (alterations omitted) (quoting *Navarette v. California*, 572 U.S. 393, 397 (2014)). "Reasonable suspicion requires more, however, than an 'inchoate and unparticularized suspicion or hunch.'" *Id.* at 91 (quoting *Terry*, 392 U.S. at 27). "[A] finding of reasonable suspicion must be premised upon a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Id.* (internal quotation marks omitted). "The particularity requirement ensures that the suspicion is grounded in specific and articulable facts, . . . while the objectivity requirement dictates a focus

---

[5] The Government does not dispute this point, and acknowledges that Sergeant Pappas's conduct after he called for a K-9 unit—less than a minute before he confirmed the driver's identity—was primarily related to his suspicions of drug activity, stating in its written opposition to Owens's motion: "Once Pappas had called the K-9 unit, it follows [that] he wouldn't simply issue a summons and allow [the car's occupants] to continue on their way." ECF No. 37 at 11. Additionally, in its closing argument at the suppression hearing, the Government agreed that the relevant question for the Court was to assess whether Sergeant Pappas had a reasonable articulable suspicion at the time he confirmed the driver's identity.

on what a reasonable law enforcement officer in the same or similar circumstances would have thought." *Id.* (internal quotation marks, citation, and alteration omitted).

Additionally, a court "must assess the presence of reasonable suspicion 'in a commonsense, case-by-case way, taking in the whole picture.'" *Dion*, 859 F.3d at 124 (quoting *United States v. McGregor*, 650 F.3d 813, 821 (2011)). "[A] fact that is innocuous in itself may in combination with other innocuous facts take on added significance." *Ruidíaz*, 529 F.3d at 30. Thus, the reasonable suspicion inquiry requires a court to look at the totality of the circumstances, rather than undertaking a "divide-and-conquer analysis" of each individual fact. *United States v. Arvizu*, 534 U.S. 266, 274 (2002). Based on the evidence presented, and for the reasons that follow, the Government has not met its burden to establish that Sergeant Pappas had a reasonable articulable suspicion of drug activity to justify extending the stop.

The Government contends that by the time that Sergeant Pappas had confirmed the driver's name and the status of her license, he had developed a reasonable articulable suspicion of criminal activity based on the following facts[6]: (1) the driver failed to properly pull over by stopping in the left median; (2) the driver appeared disheveled, suggesting possible drug use; (3) the driver was nervous and was unable to identify where in New York she had travelled from; (4) the driver stated that she had slept in the car while in New York, and had taken money set aside in the car's center console in order to purchase food; (5) the driver had a prior felony

---

[6] In characterizing the Government's arguments, I rely primarily on the prosecutor's closing argument made at the conclusion of the suppression hearing, and only secondarily on the arguments made in the Government's earlier written memorandum in opposition to the motion to suppress (ECF No. 37). The latter did not account for Sergeant Pappas's suppression hearing testimony.

conviction for a drug-related offense; (6) the back seat passenger remained sleeping even after the vehicle had come to a stop; (7) the Q-tip, baggie, and plate suggested drug activity; and (8) Sergeant Pappas recognized Owens from the June stop.

In evaluating the evidence, I am mindful of the admonition that courts should not evaluate facts using a "divide-and-conquer analysis." *Arvizu*, 534 U.S. at 274. For ease and clarity of analysis, however, I address these facts sequentially, before considering their total effect.

First, the video establishes that the driver initially pulled her car over into the left median and then, in response to Sergeant Pappas's verbal direction, crossed the Turnpike and parked on the right shoulder. Sergeant Pappas testified that he had rarely seen this occur and, when he had, it was primarily with inexperienced drivers or drivers who had reason to panic at the thought of being stopped by law enforcement. Though the driver later explained to Sergeant Pappas that she had pulled over to the median closest to the lane in which she was travelling because she had never been pulled over on the highway before, Gov't's Ex. 1 at 7:25, a car's initial stop on the left median shoulder of a highway is, as Sergeant Pappas testified, cause to believe that something might be amiss.

Second, regarding the driver's physical appearance: Sergeant Pappas testified that "[t]he female driver had a very disheveled appearance. Hair was unkept, clothes looked very untidy, no makeup, bags under the eyes. From my training, education, experience, she reminded me of somebody that's of substance abuse or having substance abuse issues." ECF No. 72 at 16. This description is largely at odds with the video evidence. The driver's clothing—pants and a sweatshirt—and her hair—

15

which was in a bun—were commonplace. She does not look disheveled, her hair does not look unusually unkempt, and her clothes do not appear untidy. Whether the driver was wearing makeup is of no relevance. The extent to which the driver had bags under her eyes cannot be determined from the video evidence. However, the dashcam video demonstrates that the driver was responsive to Sergeant Pappas's questions and generally cooperative, and Sergeant Pappas testified that she did not appear impaired. In fact, Sergeant Pappas did not perform field sobriety tests, nor did he undertake any other investigation of the driver associated with her possibly being under the influence of substances. The driver's appearance was also unremarkable considering that it was after three in the morning, and she was standing on the side of the Turnpike in October, in the rain and without a coat.[7]

Third, the driver volunteered to Sergeant Pappas that she was nervous, but the degree of nervousness she exhibited was no greater than that commonly exhibited by persons involved in a traffic stop. *See, e.g.*, *United States v. Massenburg*, 654 F.3d 480, 490 (4th Cir. 2011). However, as I have previously described, the driver pulled over on the left median of the Turnpike, which might in and of itself indicate nervousness or panic on the part of a driver. Similarly, the driver's inability to identify where in New York she had travelled from also suggested the possibility of nervousness or panic. ECF No. 37 at 9. A driver's inability to identify where they had come from may contribute to a suspicion that the driver is being evasive and has something to hide. *See Dion*, 859 F.3d at 125-26 (noting that a driver's "odd answer

---

[7] The driver repeatedly told Sergeant Pappas that she was cold, asked if she could sit in her car rather than stand outside, and was clutching her arms around herself to stay warm.

to a concededly appropriate question about travel itinerary" contributed to the police officer's reasonable suspicion).[8]

Fourth, thirteen minutes into the stop, the driver told Sergeant Pappas that she had slept in the car while she and Owens were in New York visiting Owens's family. She also said that, earlier that day, she had bought a sandwich with toll money that Owens had put in the center console. In its closing argument, the Government argued that these facts contributed to Sergeant Pappas's reasonable suspicion.[9] However, all of these statements were made several minutes after Sergeant Pappas had confirmed the driver's identity and, therefore, he could have written the driver a citation and proceeded toward completing the traffic stop. In other words, they play no part in determining whether Sergeant Pappas had a reasonable articulable suspicion at the eight-and-a-half-minute mark: that is, the point at which he transcended the stop's traffic-related mission. For this reason, I do not address the Government's arguments that these statements were suspicious.

Fifth, in its written response to Owens's motion, the Government contends that the driver's prior conviction also supported Sergeant Pappas's reasonable suspicion. In determining whether reasonable suspicion exists, the age and nature of a person's

---

[8] Sergeant Pappas later learned that the occupants of the car were returning from a visit to the metropolitan New York area, which is one of the nation's largest metropolitan areas. With this additional information, it was not especially unusual that the driver, a resident of Bangor, Maine, could not name the locality she was in while visiting the metropolitan New York area.

[9] The Government also asserted that the driver told Sergeant Pappas that she had no money and had to steal money from Owens and the rear passenger in order to buy food, and that this was also suspicious. However, this characterization is not supported by the evidence, including the dashcam video and Sergeant Pappas's testimony. A little over thirteen minutes into the stop, the driver told Sergeant Pappas that she did not "like to ask for things," including money and food, Gov't's Ex. 1 at 17:08.

prior conviction are highly relevant to the weight it should be given. *See United States v. Calvetti*, 836 F.3d 654, 667 (6th Cir. 2016) (stating that "an officer's knowledge that a defendant has a criminal history is not enough to create a reasonable suspicion, even when combined with other weaker indicators," and that "the specific nature of [a suspect's] criminal histor[y]" is significant (internal quotation marks omitted)); *United States v. Archuleta*, 619 F. App'x 683, 690 (10th Cir. 2015) (noting that defendant's criminal history "contribute[d] little to the reasonable-suspicion inquiry" when the officer's information had "no specificity with respect to the nature of [the] drug charges and no indication of how old they might be"). In *Dion*, the First Circuit rejected the defendant's argument that "his twenty-five-year-old conviction was far too old to support reasonable suspicion," explaining that "officers are permitted to consider all [of a suspect's] criminal misdeeds, regardless of when they took place." 859 F.3d at 127. The court noted, however, that it "was not just the fact of [the defendant's] conviction that [the officer] found suspicious," but that it "was also significant that [the suspect] misrepresented the extent of his criminal history," such as the drugs involved and the offense of which he had been convicted. *Id.* at 128.

Here, the driver was forthcoming about her conviction, which was eight to ten years old. She also told Sergeant Pappas that she was no longer on probation and that she hadn't "been in trouble since." Gov't's Ex. 1 at 9:19. Sergeant Pappas testified that he knew nothing more about the driver's criminal history other than what she told him, and he did not cite the driver's prior conviction in explaining why he believed he had a reasonable suspicion at the time he called for a K-9 unit. The

Government, too, does not assert that the driver misrepresented her criminal history, but simply argues that Sergeant Pappas's knowledge that the driver "had been involved in drug-related activity in the past" supported his suspicions. ECF No. 37 at 9. Viewed objectively, the driver's prior conviction was supportive of a reasonable articulable suspicion, but was not sufficient on its own to establish a reasonable articulable suspicion in this instance.

Sixth, Sergeant Pappas testified that he found it "odd" that the rear passenger was asleep when he approached the car, and that he had never participated in a traffic stop "where a passenger . . . has slept through a traffic stop without any nefarious behavior going on inside the vehicle." ECF No. 72 at 23. There is no doubt that, without some explanation, a person's sleeping through a traffic stop may be unusual and suspicious. But in this case, the rear passenger did not sleep through the stop: the video shows that, at least within the second minute of the stop, the rear passenger responded to Sergeant Pappas's request for his identification. *See* Gov't's Ex. 1 at 4:12. Additionally, given the time of night and the rainy conditions—as well as the fact that the car was driving from New York, which Sergeant Pappas learned before he called for the K-9—it is unsurprising that the passenger might have been asleep. Overall, the rear passenger's behavior did not meaningfully support a suspicion of criminal activity.

Seventh, Sergeant Pappas ascribed significance to the Q-tip, baggie, and plate, explaining that each object can play a role in the use or distribution of unlawful drugs. But in the condition and context in which Sergeant Pappas observed these three items, they were innocuous. When Q-tips are used to filter intravenous drugs, the

cotton ends are removed, but here the Q-tip was unused.[10]  Similarly, the baggie was intact, empty, and had no residue in it.  The plate was likewise clean and bore no residue, and its and the Q-tip's presence were consistent with the driver's explanation—which came prior to Sergeant Pappas receiving confirmation of her identity—that she had recently been forced to leave her apartment and was living in her car.  *See* Gov't's Ex. 1 at 10:15-10:35.  In context, the presence of these three common household objects did not contribute measurably to a suspicion of drug trafficking.

Finally, the Government contends that the knowledge Sergeant Pappas gained from his interaction with Owens during the earlier June 2019 traffic stop supported a reasonable articulable suspicion of criminal activity during the October stop.  It is true that if the June stop had turned up actual evidence of criminal activity involving Owens, an officer familiar with that evidence could reasonably factor it into his or her assessment of subsequent interactions with Owens.  *See Dion*, 859 F.3d at 127.  But that did not happen here.

The June stop resulted in no discovery of incriminating evidence, no arrest, and no conviction.  The video of the June stop reveals that the lead trooper discovered that the driver and Owens each had a prior weapons-related conviction, but it is not clear from the evidence whether Sergeant Pappas learned this information, and neither Sergeant Pappas's testimony, nor the Government in its written or oral arguments, cited to it in support of a reasonable articulable suspicion.  As for the cash

---

[10] The driver told Sergeant Pappas that she kept a box of Q-tips in the car's glove box and that she used them for hygienic purposes.  Gov't's Ex. 1 at 10:13.

found in the car during the June stop, it is not illegal or inherently suspicious for persons to possess a large amount of cash in a car. Although the video of the June stop demonstrates that the troopers suspected that Owens and the driver—both Black men travelling in a car with an out-of-state license plate—had sold or intended to sell drugs in Maine, the troopers did not discover any evidence to that effect separate from the discovery of cash. A large amount of cash is, without more, simply a large amount of cash, and not evidence of criminal activity.

The Government also argues that Owens's demeanor during the June stop was combative and confrontational, whereas during the October stop he was polite and deferential, and that this changed behavior contributed to Sergeant Pappas's having a reasonable suspicion of criminal activity during the October stop. As previously explained, a police officer's prior knowledge of specific facts about a person may be relevant to his assessment of the person's subsequent conduct. *See, e.g.*, *United States v. Fernandez*, 18 F.3d 874, 879 (10th Cir. 1994). Here, however, the assertion that Owens's behavior was "radically altered" in the October stop, as argued by the Government, ECF No. 37 at 9, is counter to the weight of the evidence.

Contrary to Sergeant Pappas's testimony and the Government's argument, in the video of the June stop, Owens—after protesting the lead trooper's assertion that he smelled burnt marijuana in the car—appears relatively calm throughout the interaction. While he does not appear particularly cooperative or comfortable in the presence of the troopers, neither does he appear to be especially combative or confrontational. In fact, early in the stop, the lead trooper described Owens to another trooper as "just staring straight ahead." Def.'s Ex. 1 at 8:39. In contrast,

Owens's companion, the driver, was argumentative with the troopers, eventually accusing them of mishandling his cash.

Sergeant Pappas's perception of Owens's behavior during the June stop may have been affected by the lead trooper's descriptions of Owens to the other troopers involved in that stop: Sergeant Pappas testified that the lead trooper had "asked for backup because the occupants of the car [were] giving him a hard time." ECF No. 72 at 19. However, the video of the June stop shows that the lead trooper began to say that the occupants were "giving [him] a hard time" immediately after his argument with the driver about Owens recording the stop, before any other troopers had arrived. Def.'s Ex. 1 at 2:51. Later in the stop, the lead trooper again demonstrated frustration with Owens's recording. *Id.* at 21:15. But Owens's conduct did not impair the lead trooper's law enforcement activity, and his decision to record the stop cannot be characterized as combative. *See Gericke v. Begin*, 753 F.3d 1, 10 (1st Cir. 2014) (concluding that "[i]t was clearly established at the time of the stop [in 2010] that the First Amendment right to film police carrying out their duties in public, including a traffic stop, remains unfettered if no reasonable restriction is imposed or in place"). A reasonable suspicion cannot be grounded on a person's constitutionally-protected recording of a police encounter. Overall, the videos do not show that Owens's behavior in October was appreciably different from what it was in June.

Moreover, in at least two additional respects, Sergeant Pappas's suppression hearing testimony misstated important facts associated with the June 2019 stop. Sergeant Pappas testified that, to the best of his recollection, a K-9 had been brought to the vehicle during the stop and had positively alerted for the presence of drugs. He

also testified that, to the best of his recollection, when he interacted with Owens during the stop, Owens had accused one or more of the troopers of having stolen a portion of the cash found during the search of the inside of the stopped vehicle. Following the hearing, the Government submitted a memorandum acknowledging that this testimony was inaccurate: "Having now reviewed the transcript and the associated exhibits, it is apparent that on these points, Sgt. Pappas's recollection was incorrect. The accusation about stolen money was made by a different occupant of the vehicle stopped on June 27, 2019, and a K-9 did not alert on the vehicle in question." ECF No. 73 at 2. Thus, Sergeant Pappas's assessment of Owens's behavior during the October stop in relation to his behavior during the June stop was based on what appears to be a faulty memory.[11]

### III. CONCLUSION

At about eight and a half minutes into the stop on October 29, 2019, Sergeant Pappas had acquired the information needed to identify the operator of the Kia and issue a citation for an expired registration violation. Thus, eight and a half minutes into the stop, Sergeant Pappas was able to take steps to complete the stop's traffic-related mission. If he did not have a reasonable suspicion of criminal activity at that time, his deviation from the traffic aspect of the stop would exceed constitutional bounds.

---

[11] Sergeant Pappas's mistaken testimony with respect to two key facets of the June 2019 stop causes me not to accept any of his testimony describing the June stop or his assessment of Owens's demeanor in October in relation to it. Owens argues separately that I should disbelieve Sergeant Pappas's hearing testimony in its entirety due to four judicial decisions granting suppression motions in other cases in which Sergeant Pappas was a witness. The limited information that Owens has provided regarding each of the cases does not provide a footing on which to assess the role that Sergeant Pappas's testimony played in the legal conclusions reached.

The Government has failed to demonstrate the existence of several of the key reasons Sergeant Pappas cited in support of a reasonable articulable suspicion of criminal activity that permitted extending the stop. These include the driver's physical appearance and demeanor; the significance to be afforded to an unused Q-tip, clean plastic baggie, and a clean plate; and Owens's demeanor in relation to the demeanor he exhibited in June. Moreover, Sergeant Pappas's mistaken memory in October of Owens's role in the vehicle stop in June necessarily affected the meaning that he ascribed to the other factors that were present during the October stop. That association contributed to Sergeant Pappas's relatively quick decision that the stop should be prolonged so that he could conduct a drug investigation. An objective assessment of what remains—the driver's initial pulling-over in the left-hand median, the driver's professed nervousness and prior conviction, and a rear-seat passenger asleep at 3:15 in the morning—does not rise to the level of a reasonable articulable suspicion that would justify prolonging the stop.

For the foregoing reasons, the prolonged detention that preceded the dog sniff in this case violated Owens's right to be secure against an unreasonable search and seizure as guaranteed by the Fourth Amendment of the Constitution of the United States.[12] Accordingly, Owens's Motion to Suppress (ECF No. 32) is **GRANTED**. All

---

[12] In the interest of completeness, I address Owens's alternative argument that even if the traffic stop was valid up until the dog sniff, Sergeant Pappas also violated the Fourth Amendment by frisking him after the dog sniff. "[A] reliable canine sniff outside a vehicle can provide probable cause to search the vehicle." *United States v. Brown*, 500 F.3d 48, 57 (1st Cir. 2007) (footnote omitted). Owens has not challenged the dog's accuracy or anything else about the reliability of the sniff, and I find that the dog sniff was adequately performed. *See id*. at 57 n.3. Thus, once the dog alerted, Sergeant Pappas had probable cause to search the car and any persons that were inside it—including Owens and the other passenger.

evidence obtained after eight and a half minutes into the October 29, 2019 traffic stop, which is at the 10:50 mark of Government's Exhibit 1, is **ORDERED** suppressed.

**SO ORDERED.**

**Dated this  13th day of July, 2021.**

_____**/s/ JON D. LEVY**_____
**CHIEF U.S. DISTRICT JUDGE**